**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| MARIS OSCAR, | No. 23-3858 |
| *Petitioner*, | Agency No. A220-509-072 |
| v. | |
| PAMELA BONDI, Attorney General, | OPINION |
| *Respondent*. | |

On Petition for Review of an Order of the
Board of Immigration Appeals

Submitted December 4, 2024[*]
Pasadena, California

Filed April 23, 2025

Before: Jay S. Bybee, Sandra S. Ikuta, and Bridget S. Bade,
Circuit Judges.

Opinion by Judge Ikuta

---

[*] The panel unanimously concludes this case is suitable for decision without oral argument. *See* Fed. R. App. P. 34(a)(2).

## SUMMARY[**]

### Immigration

The panel denied Maris Oscar's petition for review of the Board of Immigration Appeals' decision upholding the determination that he was ineligible for asylum under the firm resettlement doctrine.

Applying *Maharaj v. Gonzales*, 450 F.3d 961, 967 (9th Cir. 2006) (en banc), the panel reviewed the agency's finding of firm resettlement for substantial evidence, noting that *Maharaj*'s standard of review comported with the Supreme Court's instruction in *Wilkinson v. Garland*, 601 U.S. 209 (2024) to review such mixed questions with deference. The panel concluded that the Chilean government's issuance of an identification card that read: "Visa: PERMANENT RESIDENCE" constituted direct evidence of a firm offer of resettlement. The government therefore met its initial burden to demonstrate that the Chilean government made Oscar an offer of firm resettlement. Oscar did not meet his burden of showing that the bar did not apply where his only argument was that his Chilean residence status has since been revoked by operation of Chilean law.

Oscar also failed to show by a preponderance of the evidence that an exception to the firm resettlement bar applied. First, the evidence did not compel the conclusion that Oscar experienced substantial discrimination as a Haitian living in Chile. Moreover, Oscar did not testify that

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

he ever experienced any harm or racism from the Chilean government and did not report to the Chilean government the instances of racism that he experienced from private actors. In addition, a human rights report reflected that the Chilean government has taken action to protect residents from discrimination. Without the government's action or knowledge, the evidence did not compel the conclusion that Oscar's residence in Chile was consciously restricted by the Chilean government. Thus, substantial evidence supported the agency's determination that the firm resettlement bar rendered Oscar statutorily ineligible for asylum.

The panel addressed Oscar's claims for withholding of removal and relief under the Convention Against Torture in a concurrently filed memorandum disposition.

## COUNSEL

Rayana Thomas, Law Office of Rayana Thomas, La Mesa, California, for Petitioner.

Madeline Henley, Trial Attorney; Sabatine F. Leo, Assistant Director; Office of Immigration Litigation; Brian M. Boynton, Principal Deputy Assistant Attorney General, Civil Division; United States Department of Justice, Washington, D.C.; for Respondent.

**OPINION**

IKUTA, Circuit Judge:

Maris Oscar petitions for review of the decision of the Board of Immigration Appeals (BIA) dismissing his appeal of an order of the immigration judge (IJ) denying his application for asylum, withholding of removal, and relief under the Convention Against Torture (CAT).[1]  Because Oscar was firmly resettled in Chile before arriving in the United States, his asylum claim is statutorily barred, and we deny the petition.[2]

I

We start with the legal framework.  An alien is not eligible for asylum if "the alien was firmly resettled in another country prior to arriving in the United States."  8 U.S.C. § 1158(b)(2)(A)(vi).[3]  The statute does not define

---

[1] Oscar's petition for review and his opening brief seek review on behalf of himself, his wife Fabienne Lorjuste, and their minor child. His wife and minor child are derivative beneficiaries of his application for asylum. 8 U.S.C. § 1158(b)(3)(A).  They did not file separate applications for relief from removal and do not have derivative claims for withholding of removal or CAT protection.  *Ali v. Ashcroft*, 394 F.3d 780, 782 n.1 (9th Cir. 2005).

[2] We address Oscar's claims for withholding of removal and relief under the CAT in a memorandum disposition filed concurrently with this opinion.  *Oscar v. Bondi*, __ F. App'x __ (9th Cir. 2025).

[3] Subsection 1158(b) sets forth general conditions of eligibility for asylum in paragraph (1), allowing the Secretary of Homeland Security or Attorney General to "grant asylum to an alien who has applied for asylum in accordance with the requirements and procedures established by the Secretary of Homeland Security or the Attorney General under this section if the Secretary of Homeland Security or the Attorney

"firmly resettled," but a regulation provides the definition. *See* 8 C.F.R. § 1208.15 (2020).[4]

---

General determines that such alien is a refugee within the meaning of section 1101(a)(42)(A)[.]" 8 U.S.C. § 1158(b)(1)(A). Paragraph (2) sets forth exceptions to that eligibility, stating that "Paragraph (1) shall not apply to an alien if the Attorney General determines that" any of six disqualifying grounds exist, *id.* § 1158(b)(2)(A), the sixth of which is that "the alien was firmly resettled in another country prior to arriving in the United States." *Id.* § 1158(b)(2)(A)(vi).

[4] The operative version of that regulation reads:

> An alien is considered to be firmly resettled if, prior to arrival in the United States, he or she entered into another country with, or while in that country received, an offer of permanent resident status, citizenship, or some other type of permanent resettlement unless he or she establishes:
>
> (a) That his or her entry into that country was a necessary consequence of his or her flight from persecution, that he or she remained in that country only as long as was necessary to arrange onward travel, and that he or she did not establish significant ties in that country; or
>
> (b) That the conditions of his or her residence in that country were so substantially and consciously restricted by the authority of the country of refuge that he or she was not in fact resettled. In making his or her determination, the asylum officer or immigration judge shall consider the conditions under which other residents of the country live; the type of housing, whether permanent or temporary, made available to the refugee; the types and extent of employment available to the refugee; and the extent to which the refugee received permission to hold property and to enjoy other rights and privileges, such as travel documentation that includes a right of entry or

We review the agency's finding of "firm resettlement" for substantial evidence. *Maharaj v. Gonzales*, 450 F.3d 961, 967 (9th Cir. 2006) (en banc). The Supreme Court has clarified that whether the agency properly applied a legal standard to a given set of facts is a mixed question of law and fact. *Wilkinson v. Garland*, 601 U.S. 209, 219, 221 (2024) (holding that whether an IJ correctly applied the statutory "exceptional and extremely unusual hardship" standard to determine eligibility for cancellation of removal is a mixed question of law and fact). Whether the agency properly applied the firm resettlement standard to a given set of facts is a "primarily factual" mixed question, *id.* at 225,

---

reentry, education, public relief, or naturalization, ordinarily available to others resident in the country.

8 C.F.R. § 1208.15 (2020). In January 2021, a new version of this regulation was set to go into effect, after the Department of Homeland Security (DHS) and the Department of Justice (DOJ) (through the Executive Office of Immigration Review (EOIR)) engaged in notice-and-comment rulemaking. The new rule would have revised the exceptions. Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review, 85 Fed. Reg. 80274, 80397 (Dec. 11, 2020) (to be codified at 8 C.F.R. § 1208.15).

Three days before the new rule was to take effect, the district court for the Northern District of California issued a nationwide injunction preventing enforcement of the new rule. *Pangea Legal Servs. v. U.S. Dep't of Homeland Sec.*, 512 F. Supp. 3d 966, 970–71, 977 (N.D. Cal. 2021). That injunction remains in effect. *See* Text-Only Order, *Pangea Legal Servs. v. U.S. Dep't of Homeland Sec.*, No. 3:20-cv-9253-JD (N.D. Cal. Feb. 4, 2022), Dkt. No. 97 (administratively closing the case at the parties' request and approving a stipulation that the injunction remains in effect). The parties, the IJ, and the BIA have each conducted their analysis under the assumption that the prior version of the regulation is operative, and we do the same here. All subsequent citations to § 1208.15 refer to the 2020 version.

and therefore we continue to review the agency's firm resettlement determination with deference under the substantial evidence standard, *see Zia v. Garland*, 112 F.4th 1194, 1202 (9th Cir. 2024).

Application of the firm resettlement standard involves several steps. First, the government has an initial burden of making a prima facie showing "that the mandatory [firm resettlement] bar applies." *Maharaj*, 450 F.3d at 964. To meet this burden, the government may offer direct evidence that a country has made an offer of firm resettlement to the alien, such as "a grant of asylum, residence permit, [or] travel documents indicating the permanence of a person's status[.]" *Id.* at 972. If direct evidence is unavailable, the government can offer indirect evidence if it rises "to a sufficient level of clarity and force." *Id.* at 974 (internal quotation marks omitted). For instance, "an alien may have an 'offer' if the alien is entitled to permanent resettlement and all that remains in the process is for the alien to complete some ministerial act." *Id.* at 977 (emphasis omitted); *see also id.* ("[A] third country's offer of permanent resettlement may consist of providing a defined class of aliens a process through which they are entitled to claim permanent refuge.") (quoting *Elzour v. Ashcroft*, 378 F.3d 1143, 1152 (10th Cir. 2004)). If an alien has received an offer of resettlement, it does not matter whether the alien has allowed it to lapse— the focus is on whether the alien received an offer, not whether the alien accepted the offer. *Id.* at 969 ("The fact that an alien no longer has travel authorization does not preclude a finding of permanent resettlement when the applicant has permitted his documentation to lapse."); *accord Vang v. INS*, 146 F.3d 1114, 1117 (9th Cir. 1998) ("[T]he fact that Vang allowed his French travel document to expire after he entered the United States cannot alter the

disposition of his asylum claim."). If the government fails at the first step to present prima facie evidence of an offer of firm resettlement, the court need go no further: the mandatory firm resettlement bar does not apply.

If, however, the government succeeds in making a prima facie case, the alien bears the burden of showing by a preponderance of the evidence that the bar does not apply. 8 C.F.R. § 1208.13(c)(2)(ii) ("If the evidence indicates that [one of the enumerated grounds for denial of asylum, including firm resettlement] apply to the applicant, he or she shall have the burden of proving by a preponderance of the evidence that" the enumerated ground is not applicable); *accord Maharaj*, 450 F.3d at 969 n.5; *Cheo v. INS*, 162 F.3d 1227, 1229 (9th Cir. 1998). To rebut the prima facie case that an offer of firm resettlement exists, the alien must show that the alien does not have "the right to return and remain [in the third country] indefinitely." *Maharaj*, 450 F.3d at 969. A "mere possibility that an alien might receive permanent refuge" in a third country does not constitute an offer of permanent resettlement. *Id.* at 977 (quoting *Elzour*, 378 F.3d at 1152). But ineligibility for third-country refuge based on the alien "failing to take advantage of its procedures for obtaining relief" does not rebut the existence of an offer. *Id.* (quoting *Elzour*, 378 F.3d at 1152).

If the alien is unable to rebut the government's prima facie case that an offer exists, the alien must carry the burden of establishing an exception to firm resettlement by a preponderance of the evidence. *Id.* at 976–77 ("[T]he burden shifts to the applicant to show that the nature of his stay and ties was too tenuous, or the conditions of his residence too restricted, for him to be firmly resettled."). The first exception, not at issue here, applies when the alien's presence in the third country was necessary for

"onward travel."   8 C.F.R. § 1208.15(a).   The second exception applies when the alien's residence in the third country was "so substantially and consciously restricted by the authority of the country of refuge that he or she was not in fact resettled."   *Id.* § 1208.15(b).   By its text, this exception applies when the alien shows that he lived under a restriction that was "(1) substantial, (2) conscious, and (3) by the country's authorities."   *Aden v. Wilkinson*, 989 F.3d 1073, 1080 (9th Cir. 2021) (internal quotation marks omitted).  An IJ evaluating whether this exception applies

> shall consider the conditions under which other residents of the country live; the type of housing, whether permanent or temporary, made available to the refugee; the types and extent of employment available to the refugee; and the extent to which the refugee received permission to hold property and to enjoy other rights and privileges, such as travel documentation that includes a right of entry or reentry, education, public relief, or naturalization, ordinarily available to others resident in the country.

8 C.F.R. § 1208.15(b).  Thus, the determination whether an alien's residence was substantially restricted is a relative one, which requires comparing the alien's circumstances to the living conditions of others in the third country.  "[A] restriction is 'conscious' if the persecutors act knowingly."  *Aden*, 989 F.3d at 1080.   And a restriction is "by" the country's authorities when those authorities have failed to address it.  *Id.* at 1081. If the alien shows an exception applies, the alien is not subject to the firm resettlement bar.

## II

With this backdrop in mind, we review the relevant facts.[5]  Maris Oscar lived in Haiti.  As a literate farmer, Oscar was popular in his community because he taught other farmers how to read and write their names.  The Parti Haïtien Tèt Kale (PHTK) is a major political party in Haiti.  According to Oscar, it is also a violent gang.  In 2014, while Oscar still lived in Haiti, PHTK members asked Oscar to join them, because his support might be influential in his community given his popularity.  Oscar refused.

On September 28, 2014, four men banged on Oscar's door.  Oscar testified that he knew the men belonged to the PHTK, because they "identify themselves as members of PHTK."  The men punched and kicked Oscar, pushed his then-girlfriend (now-wife) Fabienne Lorjuste, and left only when they heard the sound of a gunshot nearby, threatening to come back "for real."  Oscar testified that he was "not really injured," and suffered only scratches.  Oscar called the police, who told him they could not come because they did not have enough fuel for their vehicle.  The next day, Oscar reported the incident to a judge, who gave Oscar an order to obtain medical care.  Because Oscar assumed that the judge and the police were politically aligned with the PHTK, he did not follow up to see if any arrests were made as a result of his report.

Two months later, in November 2014, Oscar left Haiti; Oscar resided in Chile beginning in January 2015.  Lorjuste later joined him there, where they married and had a child.

---

[5] As discussed in the concurrently filed memorandum disposition, the IJ found Oscar to be not credible.  For ease of analysis, however, the version of the facts presented in this section is taken from his testimony.

Oscar lived in Chile for six years, during which time he attended university, worked multiple jobs, and received health coverage. Lorjuste also received protection under Chile's maternity leave laws, which prevented her employer from terminating her until 18 months after their child was born. Oscar, Lorjuste, and their daughter all received Chilean identification cards. The words "Visa: PERMANENT RESIDENCE" were printed on the back of the adults' cards.

Oscar reported experiencing anti-Haitian racism in Chile. In 2019, while Oscar was waiting at a bus stop, a person driving by threw a beer bottle at him and called him a racial slur. The bottle hit Oscar and he was splashed with beer, but he was not injured. More generally, Oscar reported that private employers paid Haitians less than non-Haitians for doing the same work, and that general discrimination against Haitians was a feature of everyday life in Chile.

Oscar believes that members of the PHTK followed him to Chile. Oscar testified that in April 2021, "delinquents" tried to break into his home. Oscar testified that he suspected the delinquents were affiliated with the PHTK because he "did not have any issue with any Chilean." In May 2021, while outside a shopping center in Chile, Oscar encountered one of the men who had attacked him in 2014. The attacker was a "little bit surprised" to see Oscar and told him, "[W]e never give up. We [are] going to meet again."

Four months later, in September 2021, Oscar and his family entered the United States near Del Rio, Texas, where they were arrested and charged with being aliens "present in the United States without being admitted or paroled," 8 U.S.C. § 1182(a)(6)(A)(i). Oscar and his family conceded removability, and the IJ designated Haiti as the country of

removal with Chile as an alternative. Oscar applied for asylum, withholding of removal, and relief under the CAT. Lorjuste and their daughter are derivative applicants on Oscar's asylum claim.

After several hearings, during which Oscar and Lorjuste testified, the IJ denied Oscar's application on October 5, 2022. The IJ identified several problems with Oscar's application and denied it on multiple alternative grounds. Among them, the IJ determined that the firm resettlement bar applied because Oscar had been granted permanent residence in Chile. The IJ held that Oscar's reports of racism in Chile did not qualify him for an exception to the firm resettlement bar because none of the reported incidents occurred at the hands of the government.

Oscar appealed. In November 2023, the BIA dismissed the appeal, concluding that the firm resettlement bar applied and upholding the IJ's other determinations. Oscar petitioned for review. We have jurisdiction to review a final order of removal under 8 U.S.C. § 1252.

## III

Applying the legal framework to the facts of Oscar's case, we conclude that substantial evidence supports the agency's determination that the firm resettlement bar applies here. At the first step, the government met its burden of offering direct evidence that the Chilean government made an offer of firm resettlement to Oscar. As we have explained, the grant of a residence permit constitutes such evidence. Here, the Chilean government issued Oscar an identification card that read: "Visa: PERMANENT RESIDENCE." This is direct evidence of an offer of firm resettlement. *See Maharaj*, 450 F.3d at 972 (listing "a residence permit" or "travel documents indicating the

permanence of a person's status" as "the type of direct evidence that may satisfy the government's threshold burden and support a finding of firm resettlement").[6]

Therefore, the burden shifted to Oscar to show by a preponderance of the evidence that the bar does not apply; for example, he could do so by showing that the Chilean government did not make an offer or that Oscar would not qualify for the offer.  Oscar has not carried this burden. Oscar argues only that his Chilean residence status has since been revoked by operation of Chilean law.  This argument fails.  An offer of resettlement that has lapsed or been relinquished is still an offer and a bar to resettlement. *Maharaj*, 450 F.3d at 969; *Vang*, 146 F.3d at 1117.

Finally, Oscar argues that he carried his burden of establishing an exception to firm resettlement by a preponderance of the evidence.  8 C.F.R. § 1208.15(b). Substantial evidence supports the agency's conclusion that this exception did not apply.  Oscar argues that the conditions of his residence in Chile "were so substantially and consciously restricted by the authority" of Chile that he was in fact not resettled.  *Id.*  This argument fails.

First, the evidence does not compel the conclusion that Oscar experienced "substantial" discrimination.  *See Aden*, 989 F.3d at 1080 (explaining that for the exception to apply,

---

[6] Oscar argued before the BIA that the government failed to meet its burden because Oscar, and not the government, produced the identification card.  This argument fails. The government can carry its burden of proof with any evidence in the record. *See Maharaj*, 450 F.3d at 976–77 (the government satisfies its burden of proof when it "points to" evidence of an offer); *Davila v. Barr*, 968 F.3d 1136, 1143 (9th Cir. 2020) (the BIA is "required to evaluate all relevant evidence in the record to determine whether" a party has carried its burden).

the restrictions on residence must be "(1) substantial, (2) conscious, and (3) by the country's authorities"). Oscar argues that "Haitians [in Chile] are experiencing discrimination in all aspects of life, including racial and national origin discrimination and employment," and that he suffered discrimination, racism, and pay disparity in Chile. In support, Oscar cites the Chile 2021 Human Rights Report and his testimony before the IJ. The IJ reviewed this evidence and found it unpersuasive, especially in light of Oscar's own testimony about his life in Chile, where he rented a home, studied mechanics, worked, traveled, attended college, and received medical care and a health plan covering the birth of his child, and his wife remained employed for the legally required 18-month maternity leave period following the birth of their child. *See* 8 C.F.R. § 1208.15(b) (stating that an IJ "shall consider" the housing conditions, employment, and other rights available to the asylum applicant in the third country when evaluating the exception). Oscar's generalized evidence of country conditions and the single incident he recounts—that a person splashed him by throwing a beer bottle at him—does not compel the conclusion that his residence in Chile was "substantially" restricted in light of the other record evidence of his life there.

Moreover, the evidence does not compel the conclusion that any conditions of his residence were consciously restricted by Chile or "by the authority of" Chile. 8 C.F.R. § 1208.15(b); *Aden*, 989 F.3d at 1080. As the IJ noted, the human rights report submitted by Oscar reflects that the Chilean government has taken action to protect residents from discrimination. Moreover, Oscar did not testify that he ever experienced any harm or racism from the Chilean government, and he did not report to the Chilean government

the instances of racism that he experienced from private actors. Without the government's action or knowledge, the evidence does not compel the conclusion that Oscar's residence in Chile was "consciously" restricted "by" the Chilean government.

Because substantial evidence supports the agency's conclusion that Chile made Oscar an offer of permanent residence and that Oscar did not carry his burden of demonstrating that an exception applies, the firm resettlement bar renders Oscar statutorily ineligible for asylum.

**PETITION DENIED.**